## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

---

**AZURA, LLC**, a Nevada limited liability company,

    Plaintiff,

v.

**TRUE POS SOLUTIONS, INC.**, a Kansas corporation, **FIVE STAR PROCESSING, INC.**, a Kansas corporation, **EPHANTUS GITHINJI MWANGI**, an individual, **MALIK IQBAL**, an individual also known as **MALIK SHAHID**, and **DOES 1-10**, inclusive,

    Defendants.

Case No. 1:23-cv-217

HON.

**COMPLAINT AND JURY DEMAND**

---

| | |
|---|---|
| Christopher Robin Dryden (CA Bar No. 234476) | Scott W. Kraemer (P69822) |
| James Cannon Huber (CA Bar No. 269488) | C. Christopher Newberg (P79025) |
| GLOBAL LEGAL LAW FIRM | KUIPER KRAEMER PC |
| Co-Counsel for Plaintiff | Co-Counsel for Plaintiff |
| 322 Encinitas Blvd., Suite 200 | 180 Monroe NW, Suite 400 |
| Encinitas, CA 92024 | Grand Rapids, MI 49503 |
| (888) 846-8901 | (616) 454-3700 |
| cdryden@attorneygl.com | kraemer@k2legal.com |

---

## COMPLAINT

Plaintiff Azura, LLC sues Defendants True POS Solutions, Inc., Five Star Processing, Inc., Ephantus Githinji Mwangi, Malik S. Iqbal aka Malik Shahid and alleges as follows:

### THE PARTIES

1.    Plaintiff, Azura, LLC ("Azura"), is a Nevada limited liability company with its principal place of business in Ada, Michigan. Azura is a business that offers and facilitates, for itself and on behalf of third-party equipment lessors, the extension of lease financing for various

goods to small and medium-sized businesses commonly referred to as "merchants." Azura's lease financing is primarily focused on equipment commonly used by merchants related to payment processing for their sales and business efficiency tools. The equipment utilized by merchants pursuant to these leases typically relates to the processing of credit and debit cards and/or inventory tracking and bar coding. The equipment is often referred to as "point-of-sale" or "POS" equipment. Azura is a participant in the sales chain for these equipment leases and the financing thereof. The members of Azura, LLC are Mr. Brad Oliver, a resident of the State of Michigan, and Bonkirch Holding Co., LLC, an Arizona limited liability company.

2.      Defendant True POS Solutions, Inc. ("True POS") is, and at all relevant times has been, a corporation formed and existing under the laws of the state of Kansas, with its principal place of business located at 5819 Nieman Road, Shawnee, Kansas. At all times relevant to this action, Azura is informed and believes, and based thereon alleges, that Ephy was the sole shareholder and Chief Executive Officer/President of True POS and an officer or control person of Five Star as defined below.

3.      Defendant Five Star Processing, Inc. ("Five Star" and collectively with Ephy, True POS and Malik, "Defendants") is, and at all relevant times has been, a corporation formed and existing under the laws of the state of Kansas, with its principal place of business 5819 Nieman Road, Shawnee, Kansas. Additionally, Azura is informed and believes, and based thereon alleges, that at all times relevant herein, Ephy was an officer, director and/or controlled Five Star.

4.      Defendant Ephantus Githinji Mwangi ("Ephy") is an individual residing in Shawnee, Kansas.

5.      Defendant Malik S. Iqbal aka Malik Shahid ("Malik") is an individual residing at 17800 England Street, Bucyrus, Kansas. At all times relevant to this action, Malik was an officer

2

and the sole shareholder of Defendant Five Star Processing, Inc.

## JURISDICTION AND VENUE

6.    The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that there is diversity of citizenship among the parties and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interest, costs, and attorney's fees.

7.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because the operative written agreement between Azura, on the one hand, and Ephy and True POS on the other, sets forth this jurisdiction and venue as the forum selection.

8.    The true names and capacities, whether individual, plural, corporate, partnership, associate or otherwise of DOES 1 through 10, inclusive, are unknown to Azura who therefore sues said defendants by fictitious names. The full extent of the facts linking such fictitiously sued defendants is unknown to Azura. Azura is informed and believes, and based thereon alleges, that each of the defendants designated herein as a DOE was, and is, negligent, or in some other actionable manner, responsible for the events and happenings hereinafter referred to, and thereby negligently, or in some other actionable manner, legally and proximately caused the hereinafter described injuries and damages to Azura. Azura will hereafter seek leave of the Court to amend this Complaint to show the DOE defendants' true names and capacities after the same have been ascertained.

9.    Azura is informed and believes, and based thereon alleges, that Defendants, including DOES 1 through 10, inclusive, were agents, servants employees, successors in interest, and/or joint venturers of their co-defendants, and were as such acting within the course, scope, and authority of said agency, employment and/or venture, and that each and every defendant, as

aforesaid, when acting as a principal, was negligent in the selection of each and every other defendant as an agent, servant, employee, successor in interest, and/or joint venturer. Azura is informed and believes, and based thereon alleges, that each of the defendants designated herein as DOE aided and abetted, conspired with and/or took part in and participated with each other Defendant in all matters referred to herein, and was in some manner responsible for the injuries and losses suffered by Azura.

## FACTS COMMON TO ALL CAUSES OF ACTION

10.     Azura is an equipment lease financing wholesaler, which is to say that Azura acts as an acquiring entity for larger lease financing companies. Azura specifically operates in the micro-ticket leasing vertical retail space because most, if not all, of the equipment financed by Azura, or its upstream vendors, is for lower-dollar lease amounts for business equipment related to payment processing.

11.     Azura in its normal business practice solicits for business relationships Independent Sales Organizations ("ISOs") and independent agents that broker different goods and services to merchants. Many of the ISOs and agents that Azura works with also broker merchant processing agreements which authorize a merchant to accept electronic sales from its customers in the form of credit cards and debit cards.  Most of the equipment financed for merchants by Azura or its upstream leasing vendors as described more completely below relates to such payment processing services, tracks inventory, utilizes bar code applications and/or performs other similar sales functions.

12.     Generally, when an ISO or agent submits an equipment finance lease application ("Lease Application") to Azura on behalf of their merchant customers, Azura will review the Lease Application, confirm that all requisite documentation required to approve such Lease Application

has also been submitted, and then if necessary, perform a welcome call verifying the information in the Lease Application and that the equipment stated thereon has been delivered to the merchant applicant, assuming a delivery and acceptance of equipment document has not been provided directly by the merchant submitting the Lease Application.  Thereafter, Azura either approves or rejects the Lease Application.  If Azura approves the Lease Application, Azura will either self-fund the lease and pay a commission to the ISO or agent or sell the approved lease to one of its upstream vendors for which Azura receives a commission.  Upon receipt of the commission from the upstream vendor, Azura then pays the super-majority of such commission to the ISO or agent that submitted the approved Lease Application.

13.    Ephy/True POS is an ISO that submitted Lease Applications to Azura. Azura and Ephy/True POS began their working relationship in or around 2010. From 2010 through 2021, it is estimated that Ephy/True POS referred to Azura hundreds if not thousands of Lease Applications to Azura which generated revenue over the years from approved Lease Applications totaling in the $20,000,000 to $30,000,000 range. The successes flowing from the business relationship created a level of trust on Azura's part in Ephy/True POS. Based on this trust the business relationship between Azura and Ephy/True POS matured to a point where Azura perceived honorableness in Ephy/True POS's business dealings with Azura, and their mutual financial success as good business partners created a situation in time whereby Azura was agreeable to pre-funding Ephy/True POS's commission payment on Lease Applications where the equipment had yet to be delivered and installed, a difference from the prior course of dealings in which they had engaged.

14.    Pre-funding ISOs and agents on Lease Applications pending delivery, programming and installation of equipment is not an uncommon practice in the industry. Azura reserved the practice of pre-funding for very few ISOs and/or agents, and Ephy/True POS was one

of those few. Ephy/True POS had built the trust of Azura in the course of their relationship and Ephy/True POS was Azura's longest-tenured ISO. One of Azura's up stream partners, Time Payment, offered Azura the benefit of pre-funding of pending Lease Applications and, sometime in 2017 or 2018, Azura began to share this benefit with Ephy/True POS. From that time forward Ephy/True POS received the pre-funding benefit on virtually all submitted and pending Lease Applications, while pre-funding was otherwise used by Azura only sparingly and under minimal circumstances (e.g., when the equipment costs to an ISO or agent are substantial and a portion of the pre-funding is necessary for the equipment purchases).

15.    The pre-funding arrangement between Azura and Ephy/True POS began with an agreement which was not memorialized in writing and whereby Ephy/True POS would be pre-funded 50% of Ephy/True POS' ultimate commission related to an approved Lease Application. The pre-funding was originally contemplated to assist Ephy/True POS secure leases more easily by eliminating issues with front-end funding of equipment for the leases. Ephy/True POS indicated to Azura that the rising costs of the equipment and software required some front-end funding in order to get these deals done.

16.    In 2018, Ephy/True POS asked Azura to increase the 50% pre-funding to a 75% pre-funding, citing rising costs. It was at this time that Azura desired to memorialize the terms of its pre-funding relationship with Ephy/POS and drafted a written agreement relating thereto (as described in greater detail herein below). Azura, on the one hand, and Ephy/True POS, on the other, executed the written agreement and pre-funding continued going forward, but on the new agreement's terms wherein Ephy/True POS would receive a 75% pre-funding amount. Thereafter, Ephy/True POS continued to perform well for Azura and the trust in the relationship grew further. Azura's trust in Ephy/True POS expanded to the point where Azura was willing to fund Ephy/True

6

POS 100% of its payable commissions on certain Lease Applications.

17.    There had been few issues with the pre-funding arrangement and/or Lease Applications. In fact, no merchant had alleged misconduct against Ephy/True POS in the initiation of an equipment lease until 2022. What began to transpire in 2022 is described in greater detail herein below and is the basis for this lawsuit: Ephy/True POS, with the assistance of the other Defendants, fraudulently obtained pre-funding by a variety of schemes and using numerous illegitimate Lease Applications that were procured by fraud or which were out and out forgeries.

18.    For over a decade, the business relationship between Azura and Ephy/True POS had worked well. The red flags began to appear for Azura after it pre-funded a few Lease Applications submitted by Ephy/True POS in early 2022. For the first time, Azura began to question the legitimacy of the Lease Applications that Ephy/True POS were submitting to Azura. Beginning in early 2022, merchants whose Lease Applications had been submitted by Ephy/True POS to Azura and which were ultimately approved by Azura and/or sold to one of Azura's upstream vendors (each a "Lease"), began to make complaints. Complaints were made to Azura, Ephy/True POS and Azura's upstream vendor that purchased said Leases, concerning the veracity of said Leases.

19.    Among the issues alleged by merchant lessees were *inter* alia as follows:

a.    That Leases had been formed by Ephy/True POS's acts of forgery on submitted Lease Applications using information and documentation the merchants had provided Ephy/True POS for the separate and distinct merchant application for payment processing services also being brokered by Ephy/True POS and Five Star (the "Forged Leases");

b.    That equipment that was the subject of approved Leases related to Lease Applications submitted by Ephy/True POS had not been delivered to a merchant lessee (the

"Unperformed Leases");

      c.     That the initial payment due by a merchant lessee under certain Leases was not made or was declined or disputed and the Leases were in immediate default (the "Defaulted Leases"); and/or

      d.     That Ephy/True POS had committed other various forms of misrepresentations to said merchant lessees in the brokering of the Lease Applications and ultimate procuring of Leases (the "Misrepresented Leases").

      As these complaints were submitted to Azura, Azura immediately and continually communicated to Ephy/True POS regarding the various claims being made and, based on Azura and Ephy/True POS's long-standing business relationship and the trust which had been built over the years, Azura believed Ephy when he explained away the various issues on the respective Leases.

      20.     Over the course of 2022, the complaint submissions from merchant lessees not only continued but accelerated, and Azura eventually discovered a worrisome truth: Ephy/True POS had been using a variety of fraudulent schemes as described above which all were founded upon intentional misrepresentations and/or omissions used to induce payment from Azura for submitted Lease Applications and to receive advanced monies on those prospective deals knowing the Leases were illegitimate. The Forged Leases, Unperformed Leases, Defaulted Leases and Misrepresented Leases are all collectively hereafter referred to as the "Actionable Leases."

      21.     As described above in more detail, the 2022 business relationship between Azura and Ephy/True POS worked as follows: based on the mutual trust built in the relationship, Azura was engaged in the ongoing practice of advancing payments to Ephy/True POS for submitted Lease Applications for a certain percentage of the overall amount of the funding factor Ephy/True

POS would receive for an approved and funded Lease – sometimes this amount was the full 100% of that funding factor.  As the merchant lessee complaints continued to roll in, it became apparent to Azura that Ephy/True POS had been forging merchant lessee signatures on submitted Lease Applications and/or procuring Lease Applications based on fraudulent misrepresentations to the merchant lessees to receive the advance payments. It was also clear that Ephy/True POS had no intention of purchasing, delivering, and/or installing applicable equipment. These Actionable Leases were obtained by Ephy/True POS's fraudulent acts and omissions and Ephy/True POS' obligations to the merchant lessees and to Azura were never intended to be honored.

22.    Azura and Ephy/True POS have worked under two different sets of written agreements, those made in 2014 and then those made in 2018, which replaced the 2014 agreements. The 2018 agreements are the underlying agreements for which the claims asserted herein are based and under which Ephy/True POS perpetrated fraud on Azura and the applicable merchant lessees.

23.    Ephy on behalf of Ephy's former company, True Payment Solutions, Inc. ("True Pay"), entered into a Lessor/Vendor Agreement with Azura on June 16, 2014 (the "2014 Agreement"). Ephy personally guaranteed True Pay's obligations under the 2014 Agreement. As noted above, the 2014 Agreement and True Pay's and Ephy's performance thereunder transpired without significant incident. The 2014 Agreement was replaced in 2018.

24.    Ephy approached Azura in 2018 to amend the parties' 2014 Agreement to change Ephy's vendor identity from True Pay to True POS. Rather than amend the 2014 Agreement, a new agreement entitled "Azura, LLC Lessor/Vendor Agreement" was entered by Azura and True POS on January 18, 2018 (the "2018 Agreement"). A true and correct copy of the 2018 Agreement is attached hereto as Exhibit "1" and incorporated herein.

25.    As was the case with the prior 2014 Agreement, the essential purpose of the 2018

Agreement was for True POS vis-à-vis Ephy, and its employees, agents, subcontractors, and the like, to serve as an ISO of Azura and to obtain Lease Applications from merchants for equipment financing as described in detail in Paragraphs 11 and 12 above.

26.    While already subject to the Implied Covenant of Good Faith and Fair Dealing in the performance of the 2018 Agreement, Ephy/True POS also made express warranties and representations therein, including but not limited to the following:

a.    Any and all leases/rentals and associated documents presented by Ephy/True POS to Azura would be "good and true and all that they purport to be" (See Exhibit "1", Section 3);

b.    All executed documents (i.e., Lease Applications and all ancillary documents provided by a merchant applicant for approval) would be executed by the person or officer purported to have executed such documents and that such (would be) legal, valid, and enforceable (See Exhibit "1", Section 3A);

c.    The equipment described in the Lease Application had actually been delivered to and accepted by the merchant applicant (See Exhibit "1", Section 3B); and

d.    "All representations or warranties made by (Ephy/True POS) to (Azura) …are true, correct and not misleading, false or fraudulent in any respect." (See Exhibit "1", Section 3E).

27.    The 2018 Agreement further provided that Ephy/True POS would be subject to "recourse requirements," which included provisions for Ephy/True POS to be held responsible for paying all premiums under an approved Lease or returning all commissions, including the pre-funded amounts, paid to Ephy/True POS by Azura if and when certain trigger events transpired, as follows:

a.     If the first premium payment on an approved Lease was not made by a merchant lessee (See Exhibit "1", Section 7A);

b.     If material facts concerning an approved Lease were misrepresented to Azura or a lessee in the brokering of said Lease (See Exhibit "1", Section 7B); and/or

c.     If missed premium payments by a merchant lessee related to an approved Lease were the result of fraud, forgery, and/or misrepresentation of Ephy/True POS or its agents (See Exhibit "1", Section 7C).

28.     The 2018 Agreement's "Indemnification" provision provided as follows: "Vendor (Ephy/True POS) shall indemnify, hold harmless, release, and defend (Azura) from and against any and all losses, suits, claims, liabilities, damages, including, without limitation, reasonable attorneys' fees and court or settlement costs, arising from or in connection with (Ephy/True POS') acts or omissions hereunder. Further, (Ephy/True POS) shall indemnify, hold harmless, release, and defend (Azura) from and against any and all third party losses, suits, claims, liabilities, and damages, including, without limitation, reasonable attorneys' fees and court or settlement costs based on any consumer protection laws, including, without limitation, multi-level marketing, Biz-op or that certain California law known as the Seller Assistance Marketing Plan arising from or in connection with (Ephy/True POS') acts or omissions hereunder." (See Exhibit "1", Section 8).

29.     The 2018 Agreement's "Attorney Fees" provision provided as follows: "In the event of any litigation arising out of or related to this Agreement, the prevailing party shall be entitled to payment for its attorneys' fees and expenses occurred at trial and on appeal as determined by the court." (See Exhibit "1", Section 10).

30.     In addition to the 2018 Agreement concerning Ephy/True POS' work as an ISO of Azura, on March 26, 2018 a separate agreement titled "Vendor Progress Payment Agreement" was

entered into between Azura and Ephy/True POS concerning Lease pre-funding that Azura agreed to make to Ephy/True POS for Lease Applications that had been credit approved, but had not yet been installed, as described in further detail above. This agreement shall herein be referred to as the "Pre-Funding Agreement" and with the 2018 Agreement collectively referred to herein as the "Operative Agreements"). A true and correct copy of the Pre-Funding Agreement is attached hereto as Exhibit "2" and incorporated herein.

31.     As detailed above, under the Pre-Funding Agreement, Azura agreed to pay Ephy/True POS seventy-five percent (75%) of the commission amount that Ephy/True POS would earn on any approved Lease in advance of that particular Lease's installation and commencement date (this payment to Ephy/True POS is referred to herein as the "Up-Front Commission"). The twenty-five percent (25%) remaining balance owed to Ephy/True POS was to be paid by Azura following certain trigger events, essentially upon receipt of verification that the merchant lessees had received the equipment from Ephy/True POS that was the object of a Lease Application (and subsequent Lease) and that it had been properly programmed (as applicable), installed and was working as contemplated (this payment to Ephy/True POS is referred to herein as the "Back-End Commission"). (See Exhibit "2", Section 2).

32.     Following payment of the Up-Front Commission and within ninety (90) days thereafter, Azura had the option to cancel a Lease under a number of circumstances and the ability claw back the payments that had been made to Ephy/True POS on such cancelled Lease. Such reasons for cancellation included without limitation if equipment had not been delivered to the merchant lessee, if the first payment on the Lease was not made, if the merchant lessee canceled the Lease, or if there was a determination that fraud, forgery, or misrepresentation had occurred concerning the Lease, among other reasons. (See Exhibit "2", Sections 3 and 5).

33.    As stated above, the relationship between Ephy/True POS and Azura had worked well for many years. Ephy/True POS brokered Lease Applications which they then submitted to Azura, Azura paid Ephy/True POS the Up-Front Commission pursuant to the Pre-Funding Agreement, Azura performed its underwriting of the Lease Applications, Ephy/True POS performed on the purchase, delivery, programming, and installation of the equipment, and Ephy/True POS was funded the Back-End Commission upon Azura's verification of the initial Pre-Funding Agreement and Lease requirements. For the most part all parties in this arrangement were happy. Azura trusted Ephy/True POS to meet their contractual obligations under the Operative Agreements following the many years of a successful relationship. In 2022, Azura's trust in Ephy/True POS started to erode.

34.    Beginning in 2022, suspicions arose regarding the validity of certain Lease Applications and approved Leases submitted by Ephy/True POS. The causes for suspicion regarding these Actionable Leases included (without limitation):

a.    There were instances of payment default early in a Lease term accompanied by separate written verified complaints by merchant lessees challenging the legitimacy of the charges under an approved Lease;

b.    Installations of equipment were not being made following Ephy/True POS's receipt of the Up-Front Commission accompanied by Ephy/True POS making excuses for the delays or non-performance for installation delays, problems which had not occurred previously in the relationship; and

c.    Allegations by merchant lessees were made indicating that Lease Applications that had been approved were obtained entirely by forgery of Ephy/True POS, whereby merchant lessees indicated that Ephy had created Lease Applications and signed Leases

on their behalf without their permission, utilizing documentation previously provided by the merchant to Ephy/True POS, specifically information from their prior approved Leases or related to payment processing service applications, a distinct service and separate ISO business that Ephy/True POS performed with Malik and Five Star.  Some merchant lessees indicated that Ephy/True POS had created fake email accounts to forge electronic signatures on Lease Applications and Leases.

35.    When Azura communicated with Ephy/True POS concerning the merchant lessee complaints on the Leases as further described in Paragraph 34 above, Ephy/True POS provided a variety of excuses. All the while, Ephy/True POS claimed the Lease Applications and Leases were legitimate and continued to push harder for pre-funding on other, newer Lease Applications where the Up-Front Commission had not yet been paid, even before all requirements for receipt of those monies had been reached.

36.    Ephy/True POS's excuses concerning issues raised by Azura to Ephy/True POS were varied. Ephy/True POS indicated merchant lessees were unavailable or out of town, affecting deliveries and installations. Ephy/True POS tried to further leverage the trust Azura had developed with him/True POS, stating things akin to "have I ever let you down before?" Ephy/True POS continued to push Azura for the payment of Up-Front Commissions stating to the need for funds to purchase additional equipment for newer Lease Applications to assist in closing those deals. Ephy/True POS also began requesting that Azura wire funds to True POS instead of sending ACH payments because of a purported need for immediate monies to close prospective deals. Ephy/True POS used a variety of tactics to disguise and/or conceal the fraudulent acts and omissions. However, there were other means by which Ephy/True POS tried to manipulate Azura's trust.

37.    Ephy/True POS placed Azura in a precarious position on the Lease Applications

14

for which True POS had been paid an Up-Front Commission, as those prospective Leases which still required installations needed Ephy/True POS to assist with the completion of the equipment delivery, programming, and installation necessary to allow Azura complete the application process, effectuate the Lease and sell the Lease rights upstream to one of its vendors, then recoup the Up-Front Commission/pay the Back-End Commission to Ephy/True POS.

38.    The merchant lessees were, and in many instances of forgery had been, solely working directly with Ephy/True POS or his/its employees, agents, and contractors. The merchant lessees knew and had personal relationships with Ephy and his staff. Accordingly, Azura had to treat Ephy/True POS with a certain amount of delicacy due to the direct relationships with the merchant lessees and ongoing obligations required of Ephy/True Pos on the Leases. Ephy/True POS had already received an Up-Front Commission, and sometimes the Back-End Commission, as was detailed above in instances where 100% pre-funding occurred due to Ephy/True POS's insistence and Azura's reliance on the harmonious and successful history of dealings with Ephy/True POS. The mounting sings of trouble did not change the fact that Azura still needed Ephy/True POS to finish his/its work so the Leases could be perfected.

39.    Azura provides herein this Table "1":

/// 

/// 

/// 

/// 

/// 

/// 

///

40.    Table 1:

| Merchant # | Date Application | Method of Submission | Email Address Used for Submission | ID Type Used for Application | Issue With Legitimacy per Merchant | Amount Paid to Ephy/TruePOS |
|---|---|---|---|---|---|---|
| 1 | 05/08/19 | E-mail | (Unable to locate) | Driver license ("DL") | Forgery | $46,982.75 |
| Acts of Ephy/TruePOS: | | | | | | |
| Ephy created fraudulent email address for merchant. Lease documents were forwarded to the fraudulent email address and executed by Ephy, not would-be merchant lessee. Merchant never received equipment detailed in Lease. Merchant has submitted affidavit concerning forgery to up-stream vendor ("Time Payment") that purchased Lease payment rights from Azura. Merchant filed a police report and seeks assistance from her Local D.A. in efforts to have Ephy criminally prosecuted. | | | | | | |
| 2 | 01/02/20 | E-mail | (Unable to locate) | DL | Misrepresentation | $16,193.18 |
| Acts of Ephy/TruePOS: | | | | | | |
| Ephy represented that the leased machines would be provided to merchant on a trial basis for the first 3 months and that the machines could be returned with no further obligation after the initial 3-month period. Merchant asked to return the machines after the 3-month period. On 02/16/22, Ephy and merchant met at merchant's location wherein Ephy took the machines and indicated the lease would be terminated. Ephy did not honor the agreement to terminate the lease. | | | | | | |
| 3 | 09/27/21 | E-mail | (Unable to locate) | DL | Forgery | $4,008.26 |
| Acts of Ephy/TruePOS: | | | | | | |
| Ephy created fraudulent email address for merchant. Lease documents were forwarded to the fraudulent email address and executed by Ephy, not would-be merchant lessee. Ephy removed equipment from location following merchant notifying Ephy that her business had closed and that she had not executed the lease. Merchant filed police report and a claim with the Oklahoma Bureau of Investigations. Merchant is in the process of submitting forgery affidavit to Azura. | | | | | | |

| Merchant # | Date Application | Method of Submission | Email Address Used for Submission | ID Type Used for Application | Issue With Legitimacy per Merchant | Amount Paid to Ephy/True POS |
|---|---|---|---|---|---|---|
| 4 | 11/11/21 | E-mail | (Unable to locate) | DL | Forgery | $23,988.79 |

**Acts of Ephy/TruePOS:**

Ephy created fraudulent email address for merchant. Lease documents were forwarded to the fraudulent email address and executed by Ephy, not would-be merchant lessee. Merchant never received equipment detailed in Lease.

| 5 | 03/02/22 | E-mail | ambugua@tpsusa.com | DL & Passport | Forgery | $48,017.62 |

**Acts of Ephy/TruePOS:**

Ephy created fraudulent email address. Lease documents were forwarded to the fraudulent email address and executed by Ephy, not would-be merchant lessee. Merchant never received equipment detailed in Lease. Merchant has submitted affidavit concerning forgery to up-stream vendor ("Time Payment") that purchased Lease payment rights from Azura. Merchant filed a police report and seeks assistance from her Local D.A. in efforts to have Ephy criminally prosecuted.

| 6 | 03/16/22 | E-mail | ambugua@tpsusa.com | DL | Forgery | $23,988.79 |

**Acts of Ephy/TruePOS:**

Ephy created fraudulent email address. Lease documents were forwarded to the fraudulent email address and executed by Ephy, not would-be merchant lessee. Merchant made arrangements with Ephy to return the equipment which was the subject of the forged Lease. As of 11/19/22, Merchant has submitted affidavit concerning forgery to up-stream vendor ("Time Payment") that purchased Lease payment rights from Azura. Merchant filed a police report with the Jackson County Sheriff on 06/27/22.

| 7 | 03/23/22 | E-mail | ambugua@tpsusa.com | DL | No installation within 90 days | $80,056.07 |

**Acts of Ephy/TruePOS:**

Ephy was pre-funded 100% of the Lease commissions. No equipment was ever installed and an original installation due date of 06/24/22 was never met.

| Merchant # | Date Application | Method of Submission | Email Address Used for Submission | ID Type Used for Application | Issue With Legitimacy per Merchant | Amount Paid to Ephy/True POS |
|---|---|---|---|---|---|---|
| 8 | 06/03/22 | E-mail | ambugua@tpsusa.com | DL | No installation within 90 days | $18,001.37 |
| Acts of Ephy/TruePOS: | | | | | | |
| Ephy was pre-funded 100% of the Lease commissions. No equipment was ever installed. Merchant has indicated that Ephy forged his name on Lease documents using a fake email address. | | | | | | |
| 9 | 06/14/22 | E-mail | ambugua@tpsusa.com | DL | Misrepresentation | $25,216.45 |
| Acts of Ephy/TruePOS: | | | | | | |
| Ephy created fraudulent email address. Lease documents were forwarded to the fraudulent email address and executed by Ephy, not would-be merchant lessee. Merchant never received equipment detailed in Lease. Merchant indicated to Azura that the Lease documents were forged. First payment due on Lease was not made and the Lease is in default for failure to make first payment. | | | | | | |
| 10 | 06/14/22 | E-mail | ambugua@tpsusa.com | DL | Forgery | $60,032.04 |
| Acts of Ephy/TruePOS: | | | | | | |
| Merchant claims lease documents were executed by forgery. Merchant never received the equipment. Merchant filed a police report relating to the forgery. | | | | | | |
| 11 | 07/19/22 | E-mail | ambugua@tpsusa.com | DL & passport | Forgery | $72,070.48 |
| Acts of Ephy/TruePOS: | | | | | | |
| Merchant claims lease documents were executed by forgery. Merchant never received the equipment. Merchant received a letter from Ephy/True POS indicating that Ephy/True POS would make the first 3 Lease payments and thereafter transfer the Lease away from her corporation following the first 3 months. | | | | | | |

| Merchant # | Date Application | Method of Submission | Email Address Used for Submission | ID Type Used for Application | Issue With Legitimacy per Merchant | Amount Paid to Ephy/TruePOS |
|---|---|---|---|---|---|---|
| 12 | 08/02/22 | E-mail | ambugua@tpsusa.com | DL | Forgery | $10,844.16 |
| Acts of Ephy/TruePOS: | | | | | | |
| Ephy created fraudulent email address. Lease documents were forwarded to the fraudulent email address and executed by Ephy, not would-be merchant lessee. Merchant never received the equipment. Merchant contacted Ephy and Ephy told merchant lease was a mistake and payment issues would be fixed by Ephy; Ephy did not fix the payments issues. A police report was filed by merchant concerning the forgery. | | | | | | |
| 13 | 08/02/22 | E-mail | ambugua@tpsusa.com | Passport | Forgery | $27,993.59 |
| Acts of Ephy/TruePOS: | | | | | | |
| Ephy created fraudulent email address. Lease documents were forwarded to the fraudulent email address and executed by Ephy, not would-be merchant lessee. Merchant hired counsel to assist with claim. Counsel indicates merchant was out of the country when Lease was purported to be executed and therefore could not have executed it. | | | | | | |
| 14 | 08/02/22 | E-mail | ambugua@tpsusa.com | Passport | Forgery | $27,993.59 |
| Acts of Ephy/TruePOS: | | | | | | |
| Ephy created fraudulent email address. Lease documents were forwarded to the fraudulent email address and executed by Ephy, not would-be merchant lessee. Merchant hired counsel to assist with claim. Counsel indicates merchant was out of the country when Lease was purported to be executed and therefore could not have executed it. | | | | | | |
| 15 | 08/18/22 | E-mail | ambugua@tpsusa.com | DL | Fraud | $64,036.84 |
| Acts of Ephy/TruePOS: | | | | | | |
| Ephy told merchant that by signing documentation merchant would be relieved of obligations in existing lease.  Merchant never received equipment from Ephy. Merchant was being reimbursed for payments on lease from Ephy, but those reimbursement have since stopped. Ephy indicated to merchant that the issue would be resolved but it never was. | | | | | | |

| Merchant # | Date Application | Method of Submission | Email Address Used for Submission | ID Type Used for Application | Issue With Legitimacy per Merchant | Amount Paid to Ephy/TruePOS |
|---|---|---|---|---|---|---|
| 16 | 08/25/22 | E-mail | ambugua@tpsusa.com | (None received) | No installation within 90 days | $21,608.95 |

Acts of Ephy/TruePOS:

Merchant indicates Ephy told him new Lease was provided as a means to terminate all other prior Leases. Ephy was making the Lease payments on merchant's behalf but has stopped making those payments. Merchant never received equipment.

| 17 | 08/29/22 | E-mail | ambugua@tpsusa.com | (None received) | No installation within 90 days | $18,001.44 |

Acts of Ephy/TruePOS:

Ephy was pre-funded 100% of the Lease commissions. No equipment was ever installed.

| 18 | 09/07/22 | E-mail | ambugua@tpsusa.com | DL | No installation within 90 days | $45,164.85 |

Acts of Ephy/TruePOS:

Ephy was pre-funded 100% of the Lease commissions. No equipment was ever installed. The first payment due on the Lease following the advance payment was made and this Lease is also in payment default.

| 19 | 09/19/22 | E-mail | ambugua@tpsusa.com | DL | Default on first payment | $10,363.64 |

Acts of Ephy/TruePOS:

Ephy was pre-funded 100% of the Lease commissions. No equipment was ever installed.

| 20 | 09/23/22 | E-mail | ambugua@tpsusa.com | DL | No installation within 90 days | $40,008.01 |

Acts of Ephy/TruePOS:

Merchant made advance payment (initial payment). Merchant thereafter closed account and refuses to communicate with Azura. Lease is in default due to no payments being made after advance payment.

| Merchant # | Date Application | Method of Submission | Email Address Used for Submission | ID Type Used for Application | Issue With Legitimacy per Merchant | Amount Paid to Ephy/True POS |
|---|---|---|---|---|---|---|
| 21 | 10/05/22 | E-mail | ambugua@tpsusa.com | (none received) | No installation within 90 days | $6,493.51 |
| Acts of Ephy/TruePOS: | | | | | | |
| Ephy was pre-funded 100% of the Lease commissions. No equipment was ever installed. | | | | | | |
| 22 | 10/13/22 | E-mail | ambugua@tpsusa.com | DL | Forgery | $19,983.98 |
| Acts of Ephy/TruePOS: | | | | | | |
| Ephy was pre-funded 100% of the Lease commissions. No equipment was ever installed. | | | | | | |
| 23 | 10/14/22 | E-mail | ambugua@tpsusa.com | DL | No installation within 90 days | $9,812.93 |
| Acts of Ephy/TruePOS: | | | | | | |
| Merchant indicates Lease was forged. Merchant never received any equipment. No payments were made following the initial advance payment. Lease is in payment default. Merchant reached out to Ephy to rectify, he assured it would be fixed, then was never fixed. Owner of business at time Lease executed was not in the United States, having moved away in 2021. Lease is a forgery, per merchant. | | | | | | |
| 24 | 10/21/22 | E-mail | ambugua@tpsusa.com | DL | No installation within 90 days | $11,974.37 |
| Acts of Ephy/TruePOS: | | | | | | |
| Ephy was pre-funded 100% of the Lease commissions. No equipment was ever installed. Merchant indicates he paid cash for other equipment which is not subject of the Lease. | | | | | | |
| 25 | 11/21/22 | E-mail | ambugua@tpsusa.com | DL | Misrepresentation | $19,983.98 |
| Acts of Ephy/TruePOS: | | | | | | |
| Ephy represented to merchant that the new Lease would replace his old Lease and payment would be reduced by $100 under new Lease. Old Lease was not cancelled or satisfied and merchant now has two active Leases. | | | | | | |

41.    Table "1" represents a compilation of merchant lessees and description of facts relating to the Lease Applications and/or Leases which make them Actionable Leases as described in Paragraph 20 above, to include the amount of monies received by Ephy/True POS pursuant to the Pre-Funding Agreement. Table "1" is incorporated herein by reference. The merchant names have been redacted and merchants are labeled with numbers for purposes of the filing of this Complaint.

42.    Table "1" shows the following:

a.    Information on twenty-five (25) Actionable Leases;

b.    A characterization and description of Ephy's actions concerning each particular Lease Application or Lease;

c.    The amount paid under the Pre-Funding Agreement and now owed by Ephy/True POS to Azura on each such Lease Application or Lease;

d.    The date Lease Applications were submitted to Azura by Ephy/True POS;

e.    The medium/method by which Lease Application submissions were made to Azura;

f.    The sender's e-mail address for the Lease Application submissions, i.e., from where Ephy/True POS provided each Lease Application; and

g.    The identification type used for each Lease Application.

43.    Azura is informed and believes, and based thereon alleges, Ephy/True POS has been engaging in a "rob Peter to pay Paul" swindle for some time. The way the swindle basically worked is as follows: any new money that Ephy/True POS received as an Up-Front Commission from "newly submitted" Lease Applications to Azura would fund a merchant lessee reimbursement scheme to keep merchants at bay and stop them from reporting to Azura that there

were issues with a Lease.

44.    The basic mechanics of the merchant lessee reimbursement scheme employed by Ephy/True POS are as follows:

a.    Month 1: Ephy/True POS submits a fraudulent Lease Application or set of Lease Applications and receives the payment from Azura under the Pre-Funding Agreement. "New" Lease Applications are forged using information that Ephy/True POS already has on file. Merchant lessees are unaware of the new Leases Ephy/True POS has initiated on their behalf;

b.    Month 2: New fraudulent Lease Applications are submitted by Ephy/True POS to Azura, and pre-funding monies are transferred to Ephy/True POS. Merchant lessees that allegedly voluntarily entered Leases in Month 1 contact Ephy/True POS (who is their point of contact and purchases, installs, and services the equipment). In response, Ephy/True POS provides the merchant lessees one of two (2) likely excuses concerning issues they raised to him/it about a new Lease: 1) that some mistake has been made and that Ephy/True POS can fix it, however the immediate solution is to reimburse the merchant lessee for the "mistaken" charges (whereafter Ephy/True POS may send a reimbursement check to the merchant lessee), or 2) the new Lease is explained to be a consolidation of their old Lease(s) and the new charges reflect the consolidated monthly Lease premium along with a promise that Ephy/True POS would cover the first few months of payments as part of the consolidation process, when in fact the old Lease had been replaced by a new fraudulent Lease (or an unwanted second Lease was executed). Sometimes Ephy/True POS would pay off the old Lease to keep the existence of two Leases from unraveling the scheme. Some merchant lessees still have not discovered the existence of the new Lease or change in their monthly Lease payment(s) at Month 2;

c.    Month 3: More new and fraudulent Lease Applications are submitted and

Azura pre-funds Ephy/True POS on these additional Leases. More merchant lessees from Month 1 reach out to Ephy/True POS about their new and unwanted Leases. Previous promises from Ephy/True POS to "fix errors" or "reimburse" merchant lessees continue and money is paid out by Ephy/True POS in some instances. Month 2 merchant lessees begin to reach out with similar issues to those of Month 1 merchant lessees. Monies in the scheme's fund from Months 1 through 3 are being depleted as payments required to maintain the charade reduce the fund (read: Ponzi scheme); and

d.      Month 4: Payments necessary to keep the scheme from being discovered continue to deplete the fund and the amount required grows. New money must be brought in on new fraudulent Lease Applications. Merchant lessees that are asking questions or requiring "reimbursement" continue to increase in number. And so, thereafter from month to month, until the scheme fails due to lack of monies to maintain it.

45.      Ephy/True POS's scheme eventually broke down after about nine (9) months. Once Azura began to be directly presented with the merchant lessee complaints and investigated the claims, Ephy/True POS' nefarious acts and omissions were uncovered.  Azura started to refuse to provide any additional pre-funding to Ephy/True POS – all the while Ephy/True POS was still using the same excuses to attempt to induce new pre-funds on yet additional Lease Applications. Without new monies coming into the fund used to cover the reimbursement scheme, more merchant lessees stepped forward with complaints, including those who had remained quiet while the reimbursements were actually being made.

46.      Table "1" represents Azura's compilation of facts concerning those merchant lessees which Azura, on information and belief, asserts are or were part of Ephy/True POS's scheme(s) as detailed above. Discovery of facts and additional merchant lessees connected

to Actionable Leases continues to this date and this Complaint will be supplemented as necessary upon the discovery of additional merchant lessees and Leases which are caught up in Ephy/True POS' fraud.

47.    Azura is further informed and believes, and based thereon alleges, that Ephy/True POS did not work alone in this criminal enterprise. Ephy/True POS was and is engaged in a criminal enterprise with Malik and Five Star connected to the procurement of fraudulent Lease Applications as detailed herein. The separate and distinct procurement of merchant processing agreements for payment processing services ("MPAs") is performed by the enterprise's other business, Five Star. Ephy acts as Five Star's chief executive and controls its operations with assistance from Malik as needed for execution of agreements. On behalf of Malik/Five Star, Ephy/True POS engaged in the business of acting as a sales agent for payment processing services, i.e., payment processing for electronic transaction, primarily credit cards and debit cards, for their respective customers' purchase of a merchant's goods and/or services ("Processing Services"). Merchant lessees that accept electronic payment for their transactions needed two things: 1) equipment to process those transactions and 2) a processor with a bank relationship to authorize and settle the transactions, so these connected businesses were natural bedfellows.

48.    With Ephy/True POS brokering agreements to merchant lessees for different purposes i.e., Leases and Processing Services, Ephy/True POS and Malik/Five Star were able to conceal the above-described scheme for a significantly longer period of time, as they were able to deflect concerns about one side of the enterprise to the other side of the enterprise.

49.    Azura has also discovered that Ephy/True POS obtained pre-funding for fraudulent Leases for one of Malik's own companies, Five Star Traders (DBA It's a Dream), a business entity formed and operating in Kansas. Defendants, and each of them, schemed to set up two (2)

fraudulent Leases for equipment financing over a sixty (60) month period and which paid $150,000 to Ephy/True POS under the Pre-Funding Agreement. As part of the fraud and to hide the ruse from Azura, Defendants used a portion of the monies received to pay off Malik's existing lease obligations (of which he had four (4)). No equipment was ever delivered or received on these "new" Leases. Malik confirmed to Azura during a Lease verification call that Malik had received all the equipment and that it was installed and working, but he lied to Azura about those facts during the call.

50.    The second arm of Defendants' enterprise related to the Processing Services. Once merchants were signed up for Processing Services, income streams were created for Defendants, and each of them, which correlated to the expected future fees which would be received as commissions from the revenue produced under those MPAs. These expected commissions tied to the merchant fees became an asset which could be sold. Defendants sold some of their respective future rights to these commissions, which are referred to in the industry and referred to hereafter as "Residuals". The Residuals were sold to a separate company known as Reverse My Fees, LLC ("RMF").

51.    The agreements that Defendants entered with RMF for the purchase and sale of their respective rights to future Residuals (the residual purchase agreements, hereafter labeled the "RPAs") contain a prohibition against solicitation of merchants for Processing Services tied to any of the merchants from which the sold Residuals are derived. This restrictive covenant is in place to provide protection for RMF against Defendants' poaching merchants post sale and to prevent them from taking those merchants and submitting new merchant processing applications with other processors on their behalf. The restrictive covenant exists to protect RMF against extinguishing an existing Residual attached to a merchant account, creating a new commission/fee on a new MPA

with a new ISO, and then re-selling the new generated fee and its Residuals. Defendants entered

into these RPAs with no intention of complying with the non-solicitation clauses therein and with

an intent to solicit merchants for different Processing Services other than RMF's. The plan was to

sell the Residuals to RMF, pocket the money, then move merchants to new MPAs, either with or

without the consent of the merchant, thereby generating new Residuals from the new MPAs they

facilitated/brokered (sometimes without the knowledge of the merchant whose processor was

changed).

52.    In short, Defendants' criminal enterprise (hereafter the "Enterprise") consisted of

acts whereby 1) Ephy/True POS transmitted the forged Lease Applications to Azura to receive

pre-funding and 2) merchants were solicited for Processing Services through Five Star (as sales

agent for RMF) with the intent to later have those merchants re-solicited and moved to other

companies to create new Residual streams for Defendants to resell. Sometimes this scheme was

completed without the consent or knowledge of a merchant whatsoever. These acts of transmission

of fraudulent Lease Applications to Azura and the later re-soliciting those same merchants subject

to the RPAs with RMF for new MPAs with other ISOs or providers of Processing Services were

all performed by Defendants utilizing email, telephone and/or text message, aka by "wire." These

wires were transmitted between different states.

53.    These acts of Ephy/True POS and Malik/Five Star, and each of them, while engaged

in the Enterprise caused Azura to incur damages for payment of merchant Lease contract

obligations which have turned out to be forged and/or otherwise fraudulent or illegitimate and for

which Azura was paid, shared said payment with Defendants and now is required to reimburse to

its upstream partners. Due to the conduct of the Enterprise, Defendants are in violation of the

Racketeer Influenced & Corrupt Organizations Act ("RICO").

54. Azura is informed and believes, and based thereon alleges, that Ephy used True

POS as a mere instrumentality and that True POS was Ephy's alter ego and vice versa. Ephy used

True POS to commit the wrongs asserted herein against Azura and Azura suffered an unjust injury

as a result. Additionally, Malik served as merely a straw owner of Five Star. Ephy was the true

owner and controlled all operations of that business entity, along with being its figurehead. Azura

will amend and supplement this pleading as information concerning these issues is discovered by

Azura.

## COUNT 1
### (Breach of Contract – Against Ephy/True POS)

55. Azura repeats each and every allegation set forth above as if set forth herein.

56. Azura and Ephy/True POS are parties to the Operative Agreements (Exhibits "1"

and "2").

57. Ephy/True POS breached the Operative Agreements by, among other acts,

committing various acts and making representations amounting to fraud, forgery, and

misrepresentation regarding the legitimacy of Lease Applications and approved Leases Ephy/True

POS submitted to Azura, as further detailed in Table "1" and Paragraphs 18-20 and 34-37 herein.

58. Azura has performed in all respects under the Operative Agreements.

59. Due to Ephy/True POS's various acts in breach of the Operative Agreements in

general and, specifically, those acts which amounted to fraud, forgery, and misrepresentation,

Azura paid monies to Ephy/True POS on submitted Lease Applications and approved Leases

which were not legitimate and for which Ephy/True POS had no entitlement under the Operative

Agreements.

60. Ephy/True POS' actions under the agreement have caused damages to Plaintiff in

excess off the jurisdictional minimum. Ephy/True POS' actions are the proximate cause for the

aforementioned damages.

## COUNT 2
### (RICO Violations Under Section § 1962(c)  –
### Against Ephy/True POS/Malik/Five Star ["Defendants"]

61.    Azura repeats each and every allegation set forth above as if set forth herein.

62.    A litigant may bring a private civil action for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). See 18 U.S.C. § 1964(c).

63.    To recover under § 1962(c), a litigant must prove: (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity (known as "predicate acts"), Moon v. Harrison Piping Supply, 465 F.3d 719, 723 (6th Cir. 2006) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc*., 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985)).

64.    Once a RICO enterprise is demonstrated, the statute prohibits: (1) investing in, (2) acquiring, or (3) conducting or participating in an enterprise with income derived from a pattern of racketeering activity or collection of an unlawful debt, or (4) conspiring to commit any of the first three types of activity. 18 U.S.C. § 1962(a)–(d). The statute is to "be liberally construed to effectuate its remedial purposes." (*United States v. Turkette*, 452 U.S. 576, 587, 589, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981)).

65.    This individual cause of action focuses on 18 U.S.C. § 1962(c), which states in relevant part: "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." The conduct element of 18 U.S.C. § 1962(c) requires that the defendant have some part in directing the affairs of the enterprise. In determining whether the conduct element has been satisfied, relevant evidence includes that demonstrating some sort of "chain of command" or "other evidence of a hierarchy, even a highly limited one." *Walker v. Jackson Pub. Schs*., 42 Fed. App'x 735, 737, (6th Cir. 2002).

66.    An "enterprise includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

67.    The definitional section of RICO defines a "pattern of racketeering activity" as requiring "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). US Courts have adopted a broad literal interpretation of the statutory definition of "pattern of racketeering activity" and have held that the commission of two single predicate acts is sufficient to establish a "pattern." See, e.g., *United States v. Ianniello*, 808 F.2d 184, 190 (2d Cir. 1986), cert. denied sub nom., *Cohen v. United States*, 483 U.S. 1006, 107 S. Ct. 3229, 97 L. Ed. 2d 736 (1987); *California Architectural Building Products v. Franciscan Ceramics Inc.*, 818 F.2d 1466, 1469 (9th Cir. 1987), cert. denied, 484 U.S. 1006, 108 S. Ct. 698, 98 L. Ed. 2d 650 (1988).

68.    To constitute racketeering activity, the relevant conduct must consist of at least one of the indictable predicate acts listed in 18 U.S.C. § 1961, which includes Wire Fraud (18 U.S. Code § 1343), using interstate communication device for the purposes of executing a scheme to defraud by false or fraudulent pretenses. In order to state a violation of the wire or mail fraud statute, it is necessary to show (1) a scheme to defraud, (2) participation by the defendant[s] in the scheme, (3) specific intent to defraud, and (4) the use of the United States wires or mails in furtherance of the scheme.

69.    As described above, Defendants, and each of them, have engaged in actionable conduct under the RICO statute. The basic mechanics of the enterprise worked as follows: 1) Defendants facilitated the execution of fraudulent Lease Applications and Leases; 2) Defendants

facilitated the execution MPAs between merchants and RMF; 3) Defendants sold portions of their Residuals on the MPAs to RMF under the RPAs; 4) Defendants wrongfully facilitated the execution of new MPAs either by assisting merchants with same or establishing new contracts for merchants without their knowledge or consent, creating or attempting to create new residuals to sell to ISOs and providers of Processing Services other than RMF; and 5) Defendants utilized information obtained from merchants in the MPA application process to create additional and fraudulent Lease Applications and Lease Application, the Actionable Leases, which induced merchants into "new" Leases (if the merchant was even aware of the new Lease) and for which Defendants collected monies Azura Leasing.

70.    Defendants, and each of them, have engaged in wire fraud pursuant to 18 USC § 1343. Azura continues to investigate the actions of the enterprise and is seeking cooperation from merchants for this lawsuit in order to provide further evidence for this particular claim. Reference is made to Table "1" as evidence of the predicate criminal acts in furtherance of the goals of the Enterprise. Each merchant relied on Defendants' representation to their detriment, and each was deceived due to Defendants' actions.

71.    Defendants, and each of them, have committed the described acts willfully and with knowledge of their criminality. The damages suffered by Azura and relating to payments made to Ephy/True POS under the Pre-Funding Agreement for the Actionable Leases were directly and proximately caused by the acts of Defendants as described herein and to be supplemented upon further investigation and discovery.

72.    Defendants' acts evidence a pattern of racketeering activities, as described above. The predicate acts by Defendants of wire fraud are related and have been continuous. The purpose of the acts has been similar: to obtain monies from either Azura or RMF concerning the RPAs and

wrongfully solicited merchants (among other victims). This scheme was open-ended and continued from 2021 through the filing of this suit. Azura is informed and believes and alleges on that basis that the portion of the scheme to take merchants whose residuals have been purchased by RMF out of contract with RMF and moved into contract with another ISO to create new residuals is a threat to continue.

73.    Defendants conducted its enterprise by engaging in a pattern of racketeering activities which affect interstate commerce within the meaning of the RICO, including the acts as described above and as part of the approximately ninety (90) related acts relating to the creating of Actionable Leases, receiving the pre-funding monies from Azura, and the creation of MPAs and subsequent sale of Residuals to RMF without any intention to honor the restrictive covenants relating to solicitation or otherwise moving merchants away from RMF's Processing Services (approximating sixty-five (65) violations of the RPAs with RMF). Defendants are based in Kansas and predicate acts have been perpetrated by email and with merchants located in various states, RMF is in Louisiana and Azura is in Michigan.

74.    Defendants share an association in fact and are not part of a legal entity. Their enterprise is directly engaged in the production, distribution and acquisition of goods and services in interstate commerce. Their enterprise is distinct from any alleged culpable person.

75.    Azura meets the standing requirements under RICO and in its form is capable of holding a legal and beneficial interest in property as a properly formed LLC in the State of Michigan.

76.    Azura's injuries are directly and proximately caused by Defendants' acts. But for Defendants' conduct as alleged herein, Azura would not have suffered its financial losses pursuant to the wrongful pre-funding of fraudulent Lease Applications and Leases. Azura could not have

foreseen that Defendants were engaged in the enterprise when Azura agreed to pay Defendants under the Pre-Funding Agreement. There are no intervening causes relating to Azura's injuries and Defendants' acts are directly and causally tied to Azura's monetary losses as alleged herein.

77.    Azura is informed and believes, and based thereon alleges, that at all relevant times described herein, Ephy owned and operated True POS.

78.    Azura is further informed and believes, and based thereon alleges, that at all relevant times described herein, Malik owned and operated Five Star.

79.    Both True POS and Five Star are domiciled at the same address according to their publicly available records on file with the Kansas Department of Corporations. Furthermore, True POS and Five Star's participation was indispensable to achieving the Enterprise's goal. Ephy and Malik regularly present themselves as partners and/or owners, managing, directing, and controlling in all aspects, True POS and Five Star. Furthermore, Malik and Ephy's participation was indispensable to achieving the Enterprise's goal.

80.    To constitute racketeering activity, the relevant conduct must consist of at least one of the indictable predicate acts listed in 18 U.S.C. § 1961. Pursuant to and in furtherance of their fraudulent scheme, Defendants, and each of them, committed multiple related predicate acts, including but not limited to:

a.    Wire Fraud (18 U.S. Code § 1343) (using interstate communication device for the purposes of executing a scheme to defraud by false or fraudulent pretenses, as detailed in Table "1" which outlines dates of transmission of emails from Ephy/True POS to Azura and email addresses from which emails were delivered from Ephy to Azura);

b.    Aggravated Identity Theft (18 U.S. Code § 1028A) (knowingly transfer, possess, or use, without lawful authority, a means of identification of another person, as detailed

33

in Table "1" which outlines forms of identification used by Defendants, and each of them, without lawful authority to obtain Up-Front Commissions on fraudulent and forged Lease Applications submitted to Azura [collectively, "Merchant Confidential Information]); and

      c.    Misuse of Passports (18 U.S. Code § 1544) (willfully and knowingly use, or attempt to use, any passport issued or designed for the use of another or willfully and knowingly furnish, dispose of, or deliver a passport to any person, for use by another than the person for whose use it was originally issued and designed, as detailed in Table "1" which outlines the transactions for which Defendants, and each of them, used the passport of another unlawfully to obtain Up-Front Commissions on fraudulent and forged Lease Applications submitted to Azura).

81.    In summary, the basic indicatable misconduct was as follows:

      a.    Ephy procured merchant processing deals working as and through True POS which were made by Ephy as a sales agent, or other True POS agents at Ephy's direction, and on behalf of Five Star, owned by Malik. The merchant processing deals were made for the benefit of RMF, an ISO engaged in providing Processing Services.

      b.    The MPAs created future Residual streams in the form of commissions derived from a portion of the processing fees generated by merchants' use of RMF's payment processing services for future months. If merchants used RMF for its Processing Services, Five Star was paid residual revenue.

      c.    The expected Residuals are an asset which Five Star then sold to RMF under an RPA in the form of revenue generated by a group of bundled merchants acquired by Defendants, referred to commonly as a portfolio. RMF then owned the Residuals generated by the Processing Services from the deals which had flowed from work performed by Defendants.

      d.    When signing up any merchant for Processing Services, an application

process was initiated whereby Ephy/True POS would obtain Merchant Confidential Information in order to apply on behalf of Malik/Five Star for consideration for Processing Services to RMF.

       e.     This Merchant Confidential Information was provided along with an executed/signed MPA by the merchant. Thereafter, acceptable merchants were signed up to process electronic sales through RMF. In addition to having card transactions processed through RMF, merchants might also require equipment in order to use the Processing Services.

       f.     Ephy/True POS would submit Lease Applications for financing equipment utilizing virtually the same Merchant Confidential Information as provided for the Processing Services, along with a separately signed application. These Lease Applications were submitted to Azura. At some point, Defendants, and each of them, solicited and moved merchants they were contractually restricted from soliciting and moved them from RMF to another provider of Processing Services.

       g.     By moving the merchants, they were in essence re-selling Residuals Defendants had already sold to RMF. In addition, Merchant Confidential Information that had already been obtained by Defendants from merchants at any point in time was later used to create fraudulent Lease Applications, simply by using the same identification and Merchant Confidential Information as had been previously provided to Azura (or RMF). The "new" Lease Applications were obtained by forgery of executed applications by Ephy/True POS utilizing merchant information it already had from merchants it previously signed up.

       h.     In this instance, the victim is Azura. Azura paid Ephy/True POS in advance of commencement of leases by way of pre-funding. Once an application was submitted and approved, 75% of the money due on the lease to Ephy/True POS was provided to Ephy/True POS. The 75% of monies paid on the fraudulently obtained leases amounted to Plaintiff's injury here.

In certain instances, 100% of the monies was pre-funded.

## PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants as follows:

1.      For direct damages against Defendants in an amount to be proved at trial;

2.      For compensatory damages against Defendants for their tortious conduct in an amount to be proved at trial;

3.      For exemplary and punitive damages according to proof and in an amount sufficient to punish and set an example of Defendants;

4.      For treble damages against Defendants for actions taken in violation of the agreements referenced herein;

5.      For the corporate veil to be pierced against Ephy and in relation to his entity True POS and for any and all liability imposed against True POS to be imposed jointly and severally with Ephy;

6.      For interest due according to proof, including but not limited to prejudgment interest;

7.      For attorneys' fees according to proof;

8.      For costs of suit herein incurred; and

9.      For such other and further relief as the court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

KUIPER KRAEMER P.C.


Date: March 2, 2023                                    /s/ Scott W. Kraemer        
                                                       Scott W. Kraemer (P69822)
                                                       KUIPER KRAEMER PC
                                                       Co-Counsel for Plaintiff
                                                       180 Monroe NW, Suite 400
                                                       Grand Rapids, MI 49503
                                                       (616) 454-3700
                                                       kraemer@k2legal.com